Elmer **BERNSTEIN** et al., **Plaintiffs**,

v.

**UNIVERSAL PICTURES, INC.**, et al., **Defendants**.

v.

**COMPOSERS AND LYRICISTS GUILD OF AMERICA, INC.**, Additional Defendant on Counterclaim.

No. 72 Civ. 542.

United States District Court, S. D. New York.

June 1, 1978.

Supplemental Memorandum Decision and Order June 6, 1978.

Raymond F. Gregory, and Battle, Fowler, Lidstone, Jaffin, Pierce & Kheel, New York City, for plaintiff Elmer Bernstein; Theodore W. Kheel, Zissu, Marcus & Stein, Leonard Zissu, New York City, of counsel.

Phillips, Nizer, Benjamin, Krim & Ballon, New York City, for defendants Association of Motion Pictures and Television Producers, Columbia Pictures, Twentieth Century Fox Film, Inc., United Artists Corporation, Transamerica Corporation, Warner Bros., Warner Communications; Louis Nizer, Robert Salman, Janet Kane, New York City, of counsel.

Simpson, Thacher & Bartlett, New York City, for defendant MCA Inc., Universal Studios, Inc., Gulf & Western Industries, Inc., Paramount Pictures Corp.; James Hagan, Edward Mendrzycki, New York City, of counsel.

Shea, Gould, Climenko & Kramer, New York City, for defendant Metro-Goldwyn Mayer, Inc.

Hawkins, Delafield & Wood, New York City, for defendant American Broadcasting Companies, Inc.

Cravath, Swaine & Moore, New York City, for defendant Columbia Broadcasting System.

BRIEANT, District Judge.

On March 9, 1978, at a regularly scheduled pre-trial conference attended by counsel for all the parties, the Court, on its own initiative, raised the question whether the sheer size of this antitrust litigation and the complexity of the issues involved did not place the matter beyond the capacity of a jury's proper understanding and consequently render it unfit for jury determination. An oral order to show cause why plaintiffs' jury demand should not be struck was made on March 9, 1978. A hearing was held on April 14, 1978, and briefs have been received and considered.

For the reasons stated below, plaintiffs' demand for a jury trial is hereby stricken.

### The Dimensions of the Litigation

Familiarity with all prior decisions here and in the Court of Appeals is assumed. As noted by Chief Judge Kaufman of our Court of Appeals, this case is an "elaborate class action." *Bernstein v. Universal Pictures, Inc.,* 517 F.2d 976, 978 (2d Cir. 1975). The original complaint, filed February 7, 1972, alleged that the defendants had conspired to restrain trade by depriving the plaintiffs, a class consisting of lyricists and composers of music (hereinafter sometimes referred to collectively as "composers"), of the copyright to music and lyrics written by them for motion pictures and television shows produced (or, in the case of defendant United Artists Corp., distributed) by defendants. Plaintiffs also charged monopolization by defendants of the American market for the publication of motion picture and television music and lyrics. In their pre-trial brief, plaintiffs have further distinguished these claims, and alleged at least seven (7) separate conspiracies by which defendants violated the antitrust laws.

Although the contracts between these defendants and the class members were entered into individually, some of the parties here have, since 1960, governed their negotiations by certain standard contract terms (the "Minimum Basic Agreements" of 1960, 1965 and 1967). These Agreements were accepted by the Composers and Lyricists Guild of America ("CLGA"), to which all of the named plaintiffs and most, but not all, of the class members belong, as a result of agreement with the Association of Motion Picture and Television Producers ("AMPTP"), to which all of the motion picture defendants belong. Neither of the television network defendants is a member of the AMPTP, but it is alleged that they conformed their contract negotiations to the terms of the Minimum Basic Agreements.

Pursuant to the minimum standard terms of the Agreements, the composer received at least 50% of the performance fees for his works. The producer was assigned the production rights for the works and became

the registered copyright owner, as the proprietor of a work for hire. See, 17 U.S.C. § 26. Each of these minimum terms has on occasion been exceeded in favor of composers and lyricists with greater public favor, to enable him to retain the copyright of their work and to receive a greater percentage, or the entirety of the performance fee. These contracts more favorable than the minimum resulted from individual arms-length bargaining and reflect the greater merchantability of the works of such composers.

This action was originally filed as a class action with seventy-one (71) named plaintiffs and sixteen (16) defendants. At present sixty-five (65) named plaintiffs[1] and eleven (11) defendants[2] remain in the case. Seven major law firms represent the parties. Although class action status was ordered on June 18, 1973 by Judge Sylvester J. Ryan of this Court, the exact size of the class remains in dispute.[3] By a Memorandum Decision dated May 9, 1977, I held that all claims arising before February 7, 1968 were barred by the statute of limitations. Defendants assert that this ruling reduces the class to approximately 400, while plaintiffs continue to maintain that the class contains approximately 900 members. At the hearing held on March 9, 1978, plaintiffs estimated that the class might be as large as 1,100. An additional defendant, the Composers and Lyricists Guild of America, Inc. ("CLGA") has been brought into the action to respond to counterclaims brought by some, but not all, of the defendants.

The size of the class is an important consideration here, since each class member must prove his own injury and damages separately and must do so individually with respect to each contract made with each defendant. This is not the ordinary price-fixing or securities fraud case in which the mere filing of proofs of claim by class members suffices to establish the fact and amount of damages. Without regard to the absent class members, the named plaintiffs here have alleged the existence of more than a thousand individual contracts entered into between them and various defendants during the statutory period. This number does not include any of the contracts pursuant to which the named plaintiffs received all or part ownership of the copyright on their works; nor does it include any of the contracts made by the 900 (or 400) absent class members. In essence, as the defendants have aptly phrased it, resolution of this case as to the named plaintiffs alone will require more than a thousand "mini-trials" to determine for each contract entered into by each named plaintiff what percentage of the performance fee he might have been able to command from defendants but for the alleged antitrust conspiracy. This in turn will depend on a determination in the nature of a value judgment as to that individual's bargaining position at the stage of his career at which each disputed contract was negotiated.

The case of one of the named plaintiffs, Henry Mancini, provides an illustration of the difficulties involved. Four pages of the pre-trial order are required simply to stipulate the varying percentages of the publisher's share of the performance fees which Mr. Mancini received from the different defendants in his various contracts.

---

1. The actions of M. Stevens, M. Rosen and E. Hagen were discontinued on September 7, 1976, and those of P. Beaver, P. Faith and L. Shuken on September 1, 1977.

2. The National Broadcasting Company, Inc. ("NBC") settled with the class, and the settlement was approved on January 6, 1977. The action against Transamerica Corp., Gulf & Western Industries, Inc. and Warner Communications, Inc. (the successor of Kenney Services, Inc.) were ordered discontinued on September 17, 1976, and the action against the Association of Motion Picture and Television Producers (AMPTP), a trade association composed of some 70 producers, was discontinued on October 5, 1973.

3. By Judge Ryan's Order dated October 5, 1973, the class was defined "as all composers and lyricists, and in the case of deceased composers and lyricists, their representatives, who have composed music and/or lyrics for any of the defendants for motion pictures and television shows . . . ." As we have observed before, the first talking picture was produced in 1927, and musical embellishments on sound tracks began at about the same time.

Although the Court, by an Order dated June 2, 1976, deferred trial of the damages of absent class members until after the trial of damages of the named plaintiffs, these same considerations will eventually apply for all members of the class.

On the trial of this action, the plaintiffs will in effect call upon the finder of fact to infer, from hundreds of individual contract negotiations, the existence of a conspiracy, or rather seven separate conspiracies. More than 550 exhibits have been pre-marked for this purpose, and plaintiffs intend to call 15 witnesses. Plaintiffs have also reserved the right to call additional witnesses and produce additional exhibits as needed. In addition, if, as appears likely, it is necessary to prove what percentage of the performance fees each named plaintiff would have received on each separate contract but for the conspiracy, plaintiffs will have to call each named plaintiff (65), introduce each of the contracts (1,050) by which they claim they were injured, and give proof on the 580 individual contract negotiations involved.

To facilitate proof of their damages, plaintiffs have prepared more than 2,500 pages of accountants' worksheets (Ex. A at the hearing), which they claim involve "merely . . . an arithmetical function with which the defendants will find little to argue." (Plaintiffs' Memorandum, p. 10). Apparently, however, even these worksheets are of such a complex nature that, as plaintiffs have acknowledged, the possible claims against CBS alone were overstated by two-thirds. Defendants claim that other and still more esoteric accounting flaws underlie the worksheets and that these will have to be submitted to the trier of fact.

To counter these claims, the defendants have asserted, besides the customary general denials, numerous defenses, including laches, estoppel and plaintiffs' equal fault. In addition, defendants claim the protection of the "labor exception" to the antitrust laws. To determine the applicability of this defense it will be necessary to review the entire twenty year history of the dispute between these defendants and the CLGA, including the making of the three Minimum Basic Agreements, and to decide whether plaintiffs held themselves out as a union, and whether they were employees or independent contractors in their relationships with the defendants.

Some of the defendants here have also counterclaimed and claimed set-offs against the plaintiffs and have brought in the CLGA as an additional defendant. The counterclaims seek dismissal of the suit, injunctions, and money damages. Defendants' assertion here is that since 1954 the plaintiffs and the CLGA held themselves out as a labor union in negotiating the Minimum Basic Agreements and did so as a combination in restraint of trade, which would have been unlawful unless CLGA is to be viewed as a union. They also claim damages for illegal strikes and boycotts by plaintiffs said to have occurred when negotiations between the CLGA and the AMPTP broke down in late 1971.

To support their claims, defendants have given notice of their intention of calling almost a hundred witnesses and have pre-marked approximately 650 exhibits for introduction at the trial. They also have reserved the right to call additional witnesses and to introduce additional exhibits and offer deposition evidence. Depositions in this case began in May 1972. To date more than 70 depositions have been taken. Thirteen sets of interrogatories have been served, beginning in June 1973, and eight requests for admissions have been made and answered. Fifteen large files in the Clerk's Office of this Court are required to contain the pre-trial papers and motions filed in this case. Not all depositions have been docketed.

The minimum estimate as to the length of the trial as to the named plaintiffs alone is four months. This is based on the assumed availability of a full day of trial for five days each week—an impractical assumption in light of the stringent requirements of the Speedy Trial Act for criminal matters. Today it is often necessary to interrupt lengthy civil trials to hear motions and pleas in criminal cases, and it is

common to conduct more than one trial on a given day so as to meet the necessities of modern court administration. Unless most or all of a Judge's work load can be passed off to others, it is no longer feasible to devote every hour of every working day, for weeks on end to a single civil case.

Another significant difficulty with this case from the point of view of a jury's ability to comprehend it is the extreme variety of the defendants' postures with regard to the plaintiffs. Eight of the eleven defendants here are motion picture companies, two are television networks, and one is neither. United Artists, unlike the other seven motion picture defendants, is not a producer, and neither it nor any of its subsidiaries entered into contractual relationships with any of the plaintiffs. Four of the defendants (United Artists, ABC, CBS and MCA) signed none of the Minimum Basic Agreements. Counterclaims against the plaintiffs and the additional defendant, CLGA, have been filed by all of the defendants except ABC, Transamerica Corp., and United Artists. Some defendants are members of AMPTP, and some are not; some of the members of the plaintiff class are members of CLGA, and some are not. Some defendants contracted with various plaintiffs on terms more favorable than those contained in the Minimum Basic Agreements and some did not. Plaintiffs have claimed that some of the defendants, United Artists, for example, have conspired with persons outside the group of defendants sued here.

Factually, the interrelationships between the parties are so varied and complex that almost no statement can be made with absolute certainty about every one similarly involved. For example, Defendants' Stipulation of Facts, No. 54, states that the motion picture defendants have "almost always" used a form of contract reserving to the producer the right to delete music or words, and Stipulation of Facts No. 59 states that the same defendants have "almost always withheld" taxes from plaintiffs' compensation.

The differing postures of the individual defendants is best illustrated by reference to the case of CBS. Although CBS now is apparently also relying on the "labor exceptions" to the antitrust laws (§§ 6 and 20 of the Clayton Act, 15 U.S.C. § 17, and 29 U.S.C. § 52, and §§ 1–15 of the Norris-La-Guardia Act, 29 U.S.C. §§ 101–115), it never negotiated contract terms with the CLGA nor was a member of the AMPTP. It was party to none of the Minimum Basic Agreements. CBS always denominated the composers working for it as "independent contractors" rather than "employees," and alleges that "virtually all" of its contracts contained terms more favorable to plaintiffs than those provided by the MBA's, and usually assigned copyright ownership to the composer. CBS did, however, conform its contract negotiations with the plaintiffs to the terms of the MBA's, and in 1968 agreed with the CLGA to accept the terms of the 1967 Agreement. CBS claims, and will attempt to prove at trial, that its action in conforming its contract terms to the minimum terms of the Agreements, and its acceptance of the 1967 Agreement were each the product of coercion on the part of plaintiffs, and their refusal to deal. Accordingly, CBS claims that plaintiffs are estopped by their own inducement of CBS to join the "conspiracy"; that causation is necessarily absent; and that plaintiffs are *in pari delicto*. CBS also has counterclaimed against the plaintiffs, and against the CLGA as an additional defendant on the counterclaims, alleging that if plaintiffs are found to have been independent contractors they have since 1956 entered into at least two conspiracies in violation of the antitrust laws.

CBS also raises the specter of a retrial of *CBS v. American Society of Composers, Authors and Publishers*, 562 F.2d 130 (2d Cir. 1977) unless the essential facts can be stipulated. In that case the Court held that the licensing practices of ASCAP and BMI (Broadcast Music, Inc.), the associations which license the public performance of music and determine the publishers' and composers' shares of fees, were *per se* violations of the Sherman Act and that "the determination of how much each copyright owner

gets from the common pot is an artificial fixing of the price to that member of the combination for his composition." *Id.* at 136. CBS claims that plaintiffs in this case are seeking to "consummate" the price-fixing arrangements of ASCAP/BMI and that the "publishers' share" of the performance fee, which plaintiffs are here seeking, was itself deflated by the practices of AS-CAP/BMI. The original trial of the AS-CAP case was before Judge Lasker of this Court, without a jury. Over 1,500 trial exhibits were introduced and trial lasted approximately seven weeks.

*Discussion*

■ Plaintiffs' demand for a jury trial in this case was timely and properly made. In the ordinary case, under the rule announced in *Beacon Theatres, Inc. v. Westover,* 359 U.S. 500, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959) and *Dairy Queen, Inc. v. Wood,* 369 U.S. 469, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962), the legal and equitable claims presented here would both be tried to a jury. Despite the well-known and very pointed criticisms leveled by judges and scholars at the civil jury,[4] "trial by jury has always been, and still is, generally regarded as the normal and preferable mode of disposing of issues of fact in civil cases at law . . . . Maintenance of the jury as a fact-finding body is of such importance and occupies so firm a place in our history and jurisprudence that any seeming curtailment of the right to a jury trial should be scrutinized with utmost care." *Dimick v. Schiedt,* 293 U.S. 474, 485–86, 55 S.Ct. 296, 300, 79 L.Ed. 603 (1934).

Our discussion begins with the Seventh Amendment, which provides:

"In suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law."

For a discussion of the background of the Seventh Amendment, see *Capital Traction Co. v. Hof,* 174 U.S. 1, 6–8, 19 S.Ct. 580, 43 L.Ed. 873 (1899).

Rule 38(a), F.R.Civ.P., reiterates this principle and enlarges it with respect to trials where a statutory right is asserted:

"The right of trial by jury as declared by the Seventh Amendment to the Constitution or as given by a statute of the United States shall be preserved to the parties inviolate."

In the rare case in which a doubt might arise as to the right to a trial by jury, the traditional test has always been to make an historical analogy to the nearest common law remedy existing in 1791. See, *e. g.,* C. Wright, *Law of the Federal Courts* § 92, at 450 (3d ed. 1976). Since the decision of the Supreme Court in *Beacon Theatres, Inc. v. Westover,* 359 U.S. 500, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959), this basic historical test has been modified to take into account the expansion of legal remedies effected by the Federal Rules of Civil Procedure and the Declaratory Judgment Act.

*Beacon Theatres,* and the later case of *Dairy Queen, Inc. v. Wood,* 369 U.S. 469, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962) make it absolutely clear that "equitable relief" (in the sense of trial to the Court alone) is available in these borderline cases cognizable at law, only where the remedy at law is inadequate.

"The necessary prerequisite to the right to maintain a suit for an equitable accounting, like all other equitable remedies, is, as we pointed out in *Beacon Theatres,* 359 U.S. at 506–10, 79 S.Ct. 948, the absence of an adequate remedy at law. Consequently, in order to maintain such a suit on a cause of action cognizable at law, as this one is, the plaintiff must be able to show that the 'accounts between the parties' are of such a 'complicated

---

**4.** See, *e. g.,* J. Frank, *Law and the Modern Mind,* 170–85 (1930); Id., *Courts on Trial,* 110–11 (1949); Shapiro & Coquillette, *The Fetish of Jury Trial in Civil Cases: A Comment on Rachal v. Hill,* 85 Harv.L.Rev. 442 (1971). Despite

these criticisms, "[t]he jury is like rock music. Classical theory frowns; the masses applaud. And in a democracy the felt need of the masses has a claim upon the law." 5 *Moore's Federal Practice* ¶ 38.02[1], at 15 (2d ed. 1977).

nature' that only a court of equity can satisfactorily unravel them." 369 U.S. at 478, 82 S.Ct. at 900.

The Supreme Court's latest pronouncement on this subject, *Ross v. Bernhard,* 396 U.S. 531, 538 n. 10, 90 S.Ct. 733, 738, 24 L.Ed.2d 729 (1970), announced a three-fold test to determine the "legal nature of an issue":

> "As our cases indicate, the 'legal' nature of an issue is determined by considering, first, the pre-merger custom with reference to such questions; second, the remedy sought; and third, *the practical abilities and limitations of juries.*" (Emphasis added.)

The third prong of this test is devoid of cited authority and has been regarded by some as a departure, perhaps unintentional, from former law.[5] However, it is clear that where the "remedy sought" necessarily involves determination of complexities that "only a court of equity can satisfactorily unravel," the "practical abilities and limitations of juries" are also necessarily involved and must be considered in evaluating the right to a jury trial. The adequacy of the legal remedy necessarily involves the adequacy of the jury and its competency to find the facts. The rule of *Beacon Theatres* and *Dairy Queen* is itself "an equitable doctrine," [*Katchen v. Landy,* 382 U.S. 323, 339, 86 S.Ct. 467, 15 L.Ed.2d 391 (1966)], and the traditional equity powers of the Court certainly include the power to strike a jury demand when to allow it to stand would work an injustice.

### Pre-Merger Custom

The pre-merger custom regarding a right to a jury trial in private antitrust actions is as Justice Holmes stated in *Fleitmann v. Welsbach Co.,* 240 U.S. 27, 29, 36 S.Ct. 233, 234, 60 L.Ed. 505 (1916):

> "[W]e agree with the courts below that when penalty of triple damages is sought to be inflicted, the statute should not be read as attempting to authorize liability to be enforced otherwise than through

the verdict of a jury in a court of common law."

Although this result has been criticized and is probably not required by history, logic or statute, see, *Davis v. Marathon Oil Co.,* 57 F.R.D. 23 (N.D.Ohio 1972), aff'd., 528 F.2d 395 (6th Cir. 1975); *Finlay & Assoc., Inc. v. Borg-Warner Corp.,* 146 N.J.Super. 210, 369 A.2d 541, 543 n. 1 (1976), it undoubtedly represents the present consensus as to the law, and is accepted here. See, *Beacon Theatres, Inc., supra; Lah v. Shell Oil Co.,* 50 F.R.D. 198, 199 (S.D.Ohio 1970).

### Relief Sought

In their prayer for relief, plaintiffs here have demanded: (1) a declaration that defendants are in violation of Sections 1 and 2 of the Sherman Act; (2) preliminary and permanent injunctions against defendants' violations of the antitrust laws; (3) an injunction prohibiting defendants from imposing standard publication and exploitation terms on the plaintiffs; (4) preliminary and permanent injunctions prohibiting defendants from entering into or enforcing contracts having the effect of restraining plaintiffs from making use of their compositions; (5) a declaration of defendants' monopoly over the music publishing industry, and an order requiring defendants to divest themselves of such interests; (6) treble damages of at least $300,000,000, plus costs and attorneys' fees; and (7) any further relief deemed just and proper.

Only two of these forms of relief sought, the prayer for a declaration that defendants are in violation of the antitrust laws, and the demand for monetary damages, are clearly not equitable. The defendants have argued, in addition, however, that plaintiffs' claim for "damages" is "in the nature of restitution, another remedy traditionally available in equity," and that, "in substance [plaintiffs] are demanding that defendants 'disgorge ill-gotten gains' and return them to plaintiffs—which is precisely the definition of restitution." (Defendants' Memorandum, pp. 14–15).

---

5. See, e. g., Redish, *Seventh Amendment Right to Jury Trial: A Study in the Irrationality of*

*Rational Decision Making,* 70 Nw.L.Rev. 486, 526 (1973).

While it is true that "the constitutional right to trial by jury cannot be made to depend upon the choice of words used in the pleadings," *Dairy Queen, supra,* 369 U.S. at 477–78, 82 S.Ct. at 900, neither can the denial of that right be made to turn merely on such a characterization. "Restitution" can be legal or equitable, depending on the nature of the rights to be redressed. See, *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975); *Polstorff v. Fletcher,* 430 F.Supp. 592, 595 (N.D.Ala.1977); *Restatement of the Law of Restitution,* §§ 4 and 5; Redish, *supra* n. 5, at 528–29. In the usual antitrust case involving parties who are not in what may be described arguably as an "employer-employee" relationship, equitable restitution is obviously inapposite. Even here, however, where such a relationship apparently may have existed among various of the parties, it stretches the definition of equitable restitution and rejects established precedent unnecessarily to characterize as the prevention of "unjust enrichment" what is in reality an award of "damages to which plaintiff is legally entitled" if the allegations are upheld. See, *SEC v. Commonwealth Chemical Securities, Inc.,* 574 F.2d 90 (2d Cir. 1978).

### The Practical Abilities and Limitations of Juries

Far from being an innovation, consideration of the "practical abilities and limitations of juries," *Ross, supra,* 396 U.S. at 538 n. 10, 90 S.Ct. at 738, is actually the restatement of the Court's traditional equity powers. The early common law, in an age when many jurors could not read, reserved for itself matters involving complex writings. As early as 1603, Chancery enjoined an action at law which would have submitted to a jury matters turning on such writings. See, *Clench v. Tomley,* 21 Eng. Rep. 13 (Ch.1603). In England, although after 1775, this practice developed into the rule that some cases were "from great complexity, or otherwise, not capable of being conveniently tried before a jury." See, *Wedderburn v. Pickering,* 13 Ch.D. 769 (1879) and cases cited therein.

In the United States the problem of the intricate case was apparent from the beginning. In arguing against the proposed Seventh Amendment, Alexander Hamilton wrote in *The Federalist,* No. 83 (Lodge ed., pp. 527–28):

> "[T]he circumstances that constitute cases proper for courts of equity are in many instances so nice and intricate, that they are incompatible with the genius of trials by jury. They require often such long, deliberate, and critical investigation as would be impracticable to men called from their occupations, and obliged to decide before they were permitted to return to them . . . ."

Ultimately, Hamilton feared, the extension of the jurisdiction of law courts over traditional equity matters would "undermine the trial by jury, by introducing questions too complicated for a decision in that mode." *Id.*

In *Kirby v. Lake Shore & Mich. Southern R. R.,* 120 U.S. 130, 134, 7 S.Ct. 430, 432, 30 L.Ed. 569 (1887), an action in contract to recover money due involving numerous separate shipments of cattle and hogs, the Court held:

> "The case made by the plaintiff is clearly one of which a court of equity may take cognizance. The complicated nature of the accounts between the parties constitutes itself a sufficient ground for going into equity. It would have been difficult, if not impossible, for a jury to unravel the numerous transactions involved in the settlements between the parties, and reach a satisfactory conclusion as to the amount of drawbacks to which Alexander & Co. were entitled on each settlement. Justice could not be done except by employing the methods of investigation peculiar to courts of equity."

This equitable power was not limited to the old common law "action of account," or by modern notions of accounting procedures. Nor was the power of equity limited merely to the actual computation of monies due, as distinguished from the determination of liability. In *Fowle v. Lawrason,* 30

U.S. (5 Pet.) 495, 503, 8 L.Ed. 204 (1831) the Court held:

"In all cases in which an action of account would be the proper remedy at law, . . . the jurisdiction of a court of equity is undoubted. But in transactions not of this peculiar character, *great complexity ought to exist in the accounts, or some great difficulty at law should interpose,* . . . in order to induce a court of chancery to exercise jurisdiction." (Emphasis added.)

The courts' "traditional equity power, unaffected by the Seventh Amendment," Kirkham, *Complex Civil Litigation—Have Good Intentions Gone Awry?,* 70 F.R.D. 199, 208–09 (1976), survived in the United States principally in the form of equity's concurrent jurisdiction over actions of account. "In equity both a concurrent and exclusive jurisdiction developed over matters of account. The concurrent jurisdiction could be invoked, even though the claims involved were only legal in nature, where the remedy at law was inadequate due to the complicated nature of the accounts; otherwise not. Where the claims involved in the accounting were equitable [fraud, for example] the jurisdiction of equity was exclusive." 5 *Moore's Federal Practice,* ¶ 38.25, at 199.

A good example of this equity power over accounts is provided by *Standard Oil Co. of Kentucky v. Atlantic Coast Line R. R.,* 13 F.2d 633 (D.C., W.D.Kentucky 1926). Plaintiff in that case demanded an injunction against discriminatory freight rates and an accounting of overcharges for a period of three years. The Court upheld equitable jurisdiction:

"If the plaintiff has a full, complete, and adequate remedy at law, the bill must be dismissed. It is well settled, however, that, to constitute an adequate remedy at law, the remedy must be as complete, practicable, and as efficient, both in respect to the final relief sought and the mode of obtaining it, as the remedy in equity . . . ..

*         *         *         *         *         *

To determine what is a reasonable rate is always a most difficult problem for those trained in the consideration of such questions, and it is safe to say an almost impossible one for a jury. Furthermore, in a common-law action, as in this equity action, the plaintiff's claim would be made up of alleged excessive charges on many shipments of different commodities from and to different points, probably carrying different rates. Not only would it be necessary to establish the reasonable rate on each commodity from and to the different points involved, but a complicated accounting would be necessary, and in matters of complicated accounting the remedy in equity is generally regarded as more adequate and efficient than the remedy at law. Story, in his work on Equity Jurisprudence, section 450, recognized this fact by stating, 'There can be no real doubt that the remedy in equity, in cases of accounting, is generally more complete and adequate than it is or can be at law;' and this statement of Story's was quoted with approval by the Supreme Court in the case of *Kilbourn v. Sunderland,* 130 U.S. 505 [515], 9 S.Ct. 594, 32 L.Ed. 1005." (*Id.* at 635, 637).

These equitable principles underlie the Supreme Court's statement in *Ross, supra,* 396 U.S. at 538 n. 10, 90 S.Ct. at 738, that "the practical abilities and limitations of juries" are relevant for consideration in determining whether a right to jury trial exists in a particular case. Chief Judge Kaufman of this Circuit has aptly summarized the dilemma created by the overly complex case:

"The federal courts were never meant to deal regularly with cases which make such ravenous demands on judicial time and attention. And the problem is compounded where trial is before a jury. It is difficult, if not impossible, for a juror, however intelligent and dedicated, to follow the intricacies of extraordinarily extended cases. And such demands on jurors effectively defeat the purpose of the jury system, which was to have a cross-sectional jury of one's peers. Ordinary people cannot devote a month or more of

their lives to jury service." 1977 Judicial Conference of the Second Judicial Circuit of the United States, Transcript of Proceedings, p. 29 (September 9, 1977).

Since the *Ross* decision the lower courts have generally adopted and applied the three-pronged test. See, *e. g., Pons v. Lorillard,* 549 F.2d 950 (4th Cir. 1977), *aff'd.,* 434 U.S. 575, 98 S.Ct. 866, 55 L.Ed.2d 40 (1978); *Minnis v. International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, UAW,* 531 F.2d 850 (8th Cir. 1975); *Dawson v. Contractors Transport Corp.,* 151 U.S.App.D.C. 401, 408–15, 467 F.2d 727, 734–41 (1972) (dissenting opinion); *Fellows v. Medford Corp.,* 431 F.Supp. 199 (D.Or.1977); *Rowan v. Howard Sober, Inc.,* 384 F.Supp. 1121 (E.D.Mich.1974); *Jones v. Orenstein,* 73 F.R.D. 604 (S.D.N.Y.1977) (Bonsal, J.); *Cleverly v. Western Elec. Co.,* 69 F.R.D. 348 (W.D.Mo.1975). See also, *United States v. J. B. Williams Co.,* 498 F.2d 414 (2d Cir. 1974); *Crane v. American Standard, Inc.,* 490 F.2d 332 (2d Cir. 1973).

In only three cases, however, has application of the *Ross* test resulted in striking a jury demand, where the right to a jury was otherwise clear. In *Hyde Properties v. McCoy,* 507 F.2d 301, 306 (6th Cir. 1974), the Court held that the trial:

"involved conflicting issues of fact concerning accounting procedures used to list the assets and liabilities of the corporation. In its opinion, the district court acknowledged that 'the issues between the parties were both complex and likely to be confusing in light of the underlying facts and circumstances . . . .' We agree with this observation and consequently find as to the third [in *Ross*] factor that a jury is not especially well-qualified to dispose of such issues and that a non-jury trial of the issues is both more efficient and more likely to produce a just result. In light of the above criteria, we conclude that there is no constitutional right to a jury trial in an interpleader action when the creditor is proceeding against the fund and seeking to annul the conveyance to the transferee.

Because no right to jury trial existed, the jury empanelled by the district court was, in effect, an advisory one."

In *In re U. S. Financial Securities Litigation,* 75 F.R.D. 702 (S.D.Cal.1977), the Court struck a jury demand in a consolidated litigation arising out of a massive securities fraud. In reaching its decision that the whole case, liability and damages, was beyond the "practical abilities" of a jury, the trial court emphasized the enormous complexity of the enterprises involved in the case, and their convoluted interrelationships; the varying relationships between the different plaintiffs and defendants; and the difficulties in empaneling any jury to serve during the estimated length of the trial: "The court does not believe that a jury can rationally cope with a case of this complexity even aside from the incredibly difficult accounting problems already discussed." *Id.* at 713.

The last of these cases is *In re Boise Cascade Securities Litigation,* 420 F.Supp. 99 (W.D.Wash.1976), a securities fraud case arising from acquisition by Boise Cascade of a newsprint company in exchange for its own shares, and subsequent write-down of Boise Cascade's assets. In following the *Ross* analysis, the trial court stressed factors which are very similar to those involved in this case. First, the Court stressed the difficulties involved in determining the element of reliance separately as to each plaintiff with regard to each transaction. Secondly, the complaint presented extremely complex questions concerning the propriety of accounting methods during a five-year period, involving nearly a billion dollars. Finally, the court noted that the very length of time projected for the trial (4 to 6 months) would prevent the empaneling of a jury "of impartial minds of diverse backgrounds." That this is true is obvious: employed citizens or persons engaged in business for their own account and having familiarity with business concepts would seek to be excused upon justifiable claims of undue hardship. See, 28 U.S.C. § 1866(c). This would, at a very minimum, diminish the appearance of

fairness. When persons entitled to be excused from such a lengthy case have been eliminated from the venire, must litigants be left with a panel consisting solely of retired people, the idle rich, those on welfare, and housewives whose children are grown? Hardly a "fair cross section of the community wherein the court convenes." 28 U.S.C. § 1861.

Applying all these principles to the facts of this litigation as set forth above, it is clear, and I find, that trial of this case is beyond the "practical abilities and limitations of juries."

Assuming a minimum length for a jury trial in this case of four (4) months, an estimate which I now consider low, it would be impossible to empanel a representative jury in this case, whose verdict would enjoy the appearance of fairness.

In addition, the sheer size of the litigation and the complexity of the relationships among the parties render it *as a whole* beyond the ability and competence of any jury to understand and decide with rationality. Of course, antitrust cases in general are by their very nature complex, so that special rules have been developed in response to that complexity. See, for example, the special limitation on granting summary judgment discussed in *Mogul v. General Motors Corp.,* 391 F.Supp. 1305, 1307 (E.D.Pa.1975). The ordinary antitrust case is clearly within the competence of juries. This lawsuit is the exceptional case, not the rule.

The complexity of this case would not be substantially reduced by the severance of, for example, CBS. This relief has already been denied, and properly, by Order dated March 27, 1973. The complexity is such that even absent CBS, the matter is still beyond a jury's ability to cope with it. Severance of one or more defendants, followed by separate jury trials is likely to result in separate and inconsistent verdicts, a severe form of injustice under the facts of this case.

Finally, the special problems presented by the nature of the damages claimed here,

standing alone, would render this case unfit for jury determination. Plaintiffs' 2,500 pages of worksheets, which are compiled by a large and reputable accounting firm represent only the most preliminary statement of accounts between the parties. These sheets when presented contained significant errors caused by the complexity of the subject matter. Whether or not the accountants have applied correctly the complex principles of accounting embodied in these lengthy worksheets will have to be determined by the fact finder in this case. And to do so, he will first have to understand the underlying accounting concepts, which our average juror will find as arcane as the Internal Revenue Code.

In several early cases, including *Curriden v. Middleton,* 232 U.S. 633, 636, 34 S.Ct. 458, 58 L.Ed. 765 (1914) and *United States v. Bitter Root Development Co.,* 200 U.S. 451, 472, 26 S.Ct. 318, 50 L.Ed. 550 (1906), the court stated that "mere complication of facts alone" did not justify recourse to the equity side of the court so as to gain the benefit of its then helpful discovery procedures. This has been interpreted by at least one court as requiring something more than complexity—in that case, an accounting. *Goffe & Clarkener, Inc. v. Lyons Milling Co.,* 26 F.2d 801, 804 (D.Kan.1928). See, *In re United States Financial Securities Litigation, supra,* at 709–10. To the extent that this is a requirement, and to the extent that the rule of those cases survives *Ross v. Bernhard,* I find that it is met here.

Plaintiffs have suggested that the appointment of a Special Master pursuant to Rule 53, F.R.Civ.P., would be appropriate in this case. They argue that the possibility of referral to such a Master must be rejected before a jury demand can be struck under the *Ross* test for complexity. This is correct. The right to a jury trial, where it exists, is so central to our system of jurisprudence that abrogation of that right must be regarded as an extreme measure of last resort. Despite this, however, any role that a Special Master might be able to play in this case is so peripheral that the underlying complexities will necessarily remain.

Were it considered that a Special Master could sort out the accounting issues and testify to the jury, the larger problems would still remain. Proof of injury and damages is an essential element of liability in a private antitrust action, and such proof here will require extensive testimony about *each separate contract* entered into between each party with another and the negotiations surrounding each contract. Such matters are completely unsuitable for submission to a Master.

In addition, above and beyond all problems connected with the effect of the alleged conspiracies, there remain complex questions of liability which must be determined only after full inquiry into relationships among the parties which are truly labyrinthian.

Accordingly, although certain issues may be referable to a Special Master if desired, I find that such a reference would not alter the situation materially so far as jury competence is concerned.

It is true that more is involved in the institutional functioning of the civil jury than merely rational competence, and that "[n]ot only the ability to find objective facts should be considered in judging competence, but also the need for the tempering moral judgments the jury in effect often renders, and the effect of this latter process on the parties." Note, *The Right to a Non-jury Trial,* 74 Harv.L.Rev. 1176, 1190 (1961). Nevertheless, to hold that a jury trial is required in this case would be to hold that the Seventh Amendment gives a single party at its choice the right to an irrational verdict. For the foregoing reasons the plaintiffs' jury demand is stricken.

Even as a bench trial, this action will require many trial days, together with the attendance at court of counsel, parties and witnesses. It would be most unfortunate if after full commitment of so much of our scarce judicial resources, a full retrial of the case to a jury should be required as a result of an appeal from final judgment. Accordingly, the Court will certify for an Interlocutory Appeal pursuant to 28 U.S.C. § 1292(b) two questions: (1) was this Court empowered to strike the jury demand in this litigation; and (2) if so, does the order striking the jury demand for the reasons stated herein constitute an abuse of judicial discretion?

A failure to proceed forthwith in respect to an application for such an interlocutory appeal shall be deemed a waiver of the right to do so at a later time, and by such failure the party or parties failing to appeal shall be deemed to have withdrawn any jury demand.

So Ordered.

## SUPPLEMENTAL MEMORANDUM DECISION AND ORDER

This Court's Memorandum decision and Order dated June 1, 1978 herein struck plaintiffs' jury demand. The Court stated that these two questions would be certified for an interlocutory appeal pursuant to 28 U.S.C. § 1292(b): (1) was this Court empowered to strike the jury demand in this litigation; and (2) if so, does the order striking the jury demand for the reasons stated constitute an abuse of judicial discretion?

Supplementing that Memorandum decision and Order, the Court finds that its order of June 1, 1978, and the questions to be certified for an interlocutory appeal involve controlling questions of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may, and indeed will, materially advance the ultimate termination of the litigation. See, 28 U.S.C. § 1292(b).

All further proceedings in this litigation in this Court are hereby stayed pending application for such interlocutory appeal, and, if a hearing be granted thereon, are also stayed pending determination of such appeal.

So Ordered.