**In re BOISE CASCADE SECURITIES LITIGATION.**

**No. MDL 128.**

United States District Court,
W. D. Washington,
at Seattle.

Aug. 12, 1976.
Supplemental Order Aug. 30, 1976.

---

Joseph H. Trethewey and Winship A. Todd, Jr., Trethewey & Brink, Martin Crowder and Robert P. Piper, Karr, Tuttle, Koch, Campbell, Mawer & Morrow, Seattle, Wash., Denis T. Rice and Stuart R. Pollak, Howard, Prim, Rice, Nemerovski, Canady & Pollak, San Francisco, Cal., for plaintiffs.

John Coughenour and Arthur Claflin, Bogle & Gates, J. Paul Coie and Charles Gordon, Perkins, Coie, Stone, Olsen & Williams, William Wesselhoeft and James McGowan, Ferguson & Burdell, Seattle, Wash., Francis J. Higgins, Bell, Boyd, Lloyd, Haddad & Burns, Chicago, Ill., for defendants.

## OPINION

MORELL E. SHARP, District Judge.

Before the Court are defendants' motions to strike plaintiffs' jury demands in this securities fraud litigation. The question before the Court is whether these jury de-

mands may be stricken without conflicting with the Seventh Amendment. The Court is of the opinion that the answer is in the affirmative.

I

In simplest terms, this case centers around the acquisition of West Tacoma Newsprint Co. by Boise Cascade Corporation in November, 1969. In return for their shares in Newsprint, the stockholders, various publishing companies, received shares of Boise which were listed on the New York Stock Exchange and showed a per share market value at that time of approximately $75.

In 1971 and 1972, Boise was forced to write down its assets for a variety of reasons. The alleged partial effect of these write-downs was a drastic reduction in the price of Boise's shares, to approximately $12.00 per share. In 1972, the Tribune Publishing Co., one of the former shareholders in Newsprint, instituted a civil action alleging various violations of federal and state securities laws by Boise, its accountant, Arthur Andersen & Co., its inside directors and officers and the outside directors. Specifically, plaintiffs charged violations of §§ 12(2) and 17(a) of the Securities Act of 1933, 15 U.S.C.A. §§ 77l(2) and 77q(a); §§ 10(b) and 13(a) of the Securities Exchange Act of 1934, 15 U.S.C.A. §§ 78j(b) and 78m(a) and Rule 10b–5, 17 C.F.R. 240.-10b–5; and R.C.W.A. 21.20.010 and 21.20.-430. A short time later, similar civil actions were filed by the McClatchy newspapers and the Chronicle Publishing Co. On September 10, 1973, the Judicial Panel on Multidistrict Litigation ordered these three cases, the West Tacoma Newsprint cases, consolidated for pretrial purposes together with a case from the Eastern District of Missouri, *Lewin, et al. v. Boise Cascade Corp., et al. Lewin* involves a merger of a corporation into Boise at almost the same time Newsprint was acquired and involving the same financial statements of Boise. Most of the claims in *Lewin* are identical to the claims in the West Tacoma Newsprint cases.

Still another civil action was filed in this district in June, 1974, by the Longview and World Publishing companies against the same corporate and individual defendants. The allegations in this action are the same as in the other West Tacoma Newsprint cases.

In April, 1973, the Court appointed a Special Master to supervise discovery in the West Tacoma Newsprint cases. After the opinion of the Judicial Panel on Multidistrict Litigation in September, 1973, the order of reference was declared to be in full force and effect as to all the cases.

By Order of March 19, 1976, motions by defendants to sever the various cases for trial were denied. The Court granted motions by plaintiffs to consolidate the West Tacoma Newsprint cases for trial but reserved ruling on whether to consolidate the *Lewin* case until the completion of discovery.

Amended complaints were filed in May and June of 1975 in most of the cases. As of this date, it appears that all counsel have expended over 50,000 lawyer man hours in this litigation and that in excess of 900,000 documents have been produced.

A summary of the relevant allegations of misrepresentation and omission would be inadequate in order to show the true nature of this litigation. Instead, the most relevant portion of the complaint in the *Chronicle* case, paragraph 21, is set forth in full in the Appendix to this Opinion and Order.

II

Defendants see the number of plaintiffs as a primary problem in managing the trial. They feel that each plaintiff has a different measure of reliance and that it will be necessary to contain the proof of each plaintiff to that particular plaintiff.

The question of reliance is, of course, a vital one in establishing liability under both the state and federal securities laws. This is particularly true under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C.A. § 78j(b) and S.E.C. Rule 10b–5. An examination of that factor pro-

vides some idea of the difficulties facing the trier of facts in this case.

The materiality of an omission has been held to create a presumption of reliance, or causation, in a securities fraud case. *See Affiliated Ute Citizens of Utah v. United States,* 406 U.S. 128, 153–54, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972). While reliance may be disproved, the burden placed upon defendants to do so varies according to the context of the transaction. The Ninth Circuit advanced the following rationale for not requiring proof of reliance in an open-market situation:

> Materiality circumstantially establishes the reliance of some market traders and hence the inflation in the stock price— when the purchase is made the causational chain between defendant's conduct and plaintiff's loss is sufficiently established to make out a prima facie case.

*Blackie v. Barrack,* 524 F.2d 891, 906 (9th Cir. 1976). Thus, if deception affected the market resulting in damage to a plaintiff, the opportunity to rebut presumed causation has been found to be "virtually meaningless." *Little, et al. v. First California Company, et al.,* 532 F.2d 1302, 1304 (9th Cir. 1976). If presumed causation exists with respect to any facet of this complaint, it will be necessary to determine the character of the transaction in order to determine whether and to what extent the presumption may be disproved.

Both misrepresentations and omissions are alleged in this case, and while the two are not mutually exclusive, *see Little, et al. v. First California Company, et al., supra,* at 1304, the trier of fact may have to analyze each of the allegations in paragraph 21 with respect to each of the parties to determine the character of each transaction.

Other portions of the complaints present complicated concepts that will involve lengthy explanation and documentary evidence.

For example, the complaints allege that Boise failed to make proper provision for discount reserves with respect to its land sales. These reserves would reflect the difference between the interest charged on the unpaid balances on the notes of land purchasers and the then current market rate of interest. The foundation for this will likely require proof that a market rate of interest existed with respect to the land sales in question; the rate or rates charged by Boise; the amount of time that the market rate exceeded the rate actually charged and the amount of interest outstanding at various times. It may also be necessary to present evidence regarding the reasonableness of the rate or rates charged by Boise as well as proof relating to usury laws and state regulations, if any, of land sales and installment purchase contracts.

As another example, plaintiffs claim that Boise chose improper bases for the valuation of assets acquired in corporate acquisitions effected under 26 U.S.C.A. § 334(b)(2). As a result, it is alleged that Boise failed to note that it could be liable for up to $5,000,-000 in federal income taxes. One of the issues here would be whether Boise properly accrued potential judgments resulting from litigation with the Internal Revenue Service before a United States District Court and the United States Tax Court. From the testimony produced at a hearing before the Court, it appears the potential tax liabilities may not have been accrued at one time. Rather, a portion of each liability may have been accrued during various stages of the litigations in question in the form of an unpaid tax obligation. It may have been reasonable and proper to determine at the outset of the litigation that it would be likely that no tax would be found owing, but to accrue a portion after an adverse judgment and to accrue the remainder after an unsuccessful appeal. Or, it may be that the entire amount was accrued in increments at various times throughout the litigation.

Other portions of the complaints which present unique and difficult accounting concepts are the following:

> Boise improperly allocated unit land costs to the costs of goods sold so as to understate the costs of goods sold for more desirable lots, overstate the value of the remaining land inventory, and conse-

quently to overstate profits derived from the sale of recreational land.

And also:

> Boise's quarterly financial statements for the first three quarters of each year, including 1969, failed to recognize ratably and proportionately various adjustments made in the fourth quarter and therefore overstated net income for the first three quarters accordingly. The effect of said fourth quarter adjustments was concealed by the device of pooling the financial results of profitable companies acquired by merger during the year.

In addition to the complex accounting and proof questions, there is the very real possibility of substantial prejudice to the defendants due to evidence that Boise settled numerous civil actions brought by the State of California and others alleging improper land development and marketing practices. It is alleged that Boise knew of these practices and their nature and that it failed to maintain a reserve fund to satisfy potential judgments and settlements, as well as also failing to disclose the nature of the practices. Previously, the Court ruled that:

> [p]laintiffs are entitled to prove the cause of the write-down in question. Without proof of the settlement, the precise amount of the write-down itself could not be shown. In this case, the amount of the settlement constitutes a material portion of the write-down and its existence in fact cannot be denied or ignored.

Order of June 23, 1976, at p. 2.

Two questions are presented by this portion of the complaint: First, whether jurors will consider settlement of the California lawsuits in the amount of approximately $50,000,000 an admission of liability and second, if they do, whether they will speculate that liability there is tantamount to proof of fraud with respect to these plaintiffs. The answer to these questions can only be stated with qualification.

Finally, and most important, in order to determine whether liability exists, the fact finder will have to analyze the Boise accounting, not only of the accounts as they existed at the time of the merger, but as the plaintiffs claim they should have existed. It is anticipated that experts for each side will have to go through the accounting techniques and resulting figures in each of the areas complained of in paragraph 21. In all, *assets and liabilities in excess of a billion dollars are involved and a period of more than five years will have to be examined.*

The validity of the accounting practices will undoubtedly require evidence extrinsic to the accounting sheets. For example, it is alleged that Boise failed to maintain adequate reserves for bad debts in connection with the retail sales of recreational property. It is alleged that those sales were booked for the total purchase price although a minimal down payment was paid by the purchaser. The rest was covered by a note. Deposition testimony indicates that the national recession in the early part of this decade forced many purchasers to default. Thus, the truth or falsity of many of the allegations may have to be determined in the light of economic conditions as they existed a decade ago.

Competing theories of accounting will be presented for all of these matters. It has been suggested that more than one "generally accepted accounting principle" can be applied to a particular booking problem but that not all of those principles fairly reflect the financial condition of the corporation.

In sum, it appears to this Court that the scope of the problems presented by this case is immense. The factual issues, the complexity of the evidence that will be required to explore those issues, and the time required to do so leads to the conclusion that a jury would not be a rational and capable fact finder.

### III

There can be no doubt that jury trials are favored in civil litigation in this country. The combination of the Seventh Amendment and the merger of actions at law and in equity into a single civil action under the Federal Rules of Civil Procedure encour-

ages the use of juries to determine facts. *See Ross v. Bernard,* 396 U.S. 531, 539–40, 90 S.Ct. 733, 24 L.Ed.2d 729 and Opinion of Stewart, J., dissenting, *see also* 28 U.S.C.A. § 1861 and Redish, *Seventh Amendment Right to Jury Trial: A Study in the Irrationality of Rational Decision Making,* 70 Nw.U.L.Rev. 486, 490–98.

However broad this policy may be, the Supreme Court has recognized that the use of juries is not without limits. In *Ross v. Bernard, supra,* the Court set forth three factors which determine the susceptibility of a claim to trial by jury:

> [F]irst, the pre-merger custom with reference to such questions; second the remedy sought; and third, the practical abilities and limitations of juries. *Id.* at 538 n. 10, 90 S.Ct. at 738.

No authority was cited for these three factors. As for the first two, Supreme Court precedent appears so clear as to be obvious. *See e. g., Parsons v. Bedford,* 28 U.S. (3 Pet.) 443, 447, 7 L.Ed. 732 (1830) (Story, J.). The third part is not explicit from previous opinions.

The procedural safeguards inherent in our legal system provide the impression and fact of fairness to the litigants and society. This is necessary in order to assure obedience to judgments and resort to the legal system as the only sanctioned means of settling disputes in a complex civilized society. Indeed, under the Fifth and Fourteenth Amendments, the legitimacy of government action is measured in terms of fairness.

Central to the fairness which must attend the resolution of a civil action is an impartial and capable fact finder. A properly selected panel of veniremen must generally be presumed to yield an impartial and capable jury. However, at some point, it must be recognized that the complexity of a case may exceed the ability of a jury to decide the facts in an informed and capable manner. When that occurs, the question arises as to whether the right and necessity of fairness is defeated by relegating fact finding to a body not qualified to determine the facts. The third part of the analysis in

footnote 10 to the majority opinion in *Ross v. Bernard, supra,* directly recognizes this. *See also* Kirkham, *Complex Civil Litigation-Have Good Intentions Gone Awry?* 70 F.R.D. 199, 208 (1976).

Of course, the point at which a jury's limitations exceed its abilities is not precise nor is it easy of definition. No single factor alone can dictate that a jury should not hear a case. As in this case, a number of factors must combine to convince the Court that a jury would be incapable of fairly deciding the case.

## IV

■ It must be apparent that any jury chosen to hear this case will not be a fair cross section of the community at large because of the estimated trial time of four to six months. It would not be unreasonable to excuse prospective jurors from serving in this civil case if they believe that service for that period of time would impair their employment. At the outset, then, the availability of employed persons to serve on this jury is limited. This suggests that at least the appearance of fairness would be diminished, if not eliminated, when a lengthy civil action involving millions of dollars in potential damages in a commercial setting would be heard by jurors who have not had exposure to a contemporary commercial or business environment. This should not be taken to mean that a non-employed person is somehow less able to determine facts. Rather, a basic purpose of the jury, the determination of facts by impartial minds of diverse backgrounds, is defeated if a sizable and significant portion of the community must be excluded from service.

Pointing out the limits of a jury to hear an extended civil action does not answer the problems presented by a particular case unless it can be shown that trial to the Court would be superior.

In addition to the Court's experience in presiding over other complicated cases involving commercial matters, the Court has available to it tools that are unwieldy in the possession of a jury. Among these tools are

review of daily transcripts; admission of depositions into evidence instead of reading relevant portions aloud; review of selected portions of testimony from the reporter's notes and flexibility in scheduling trial activities. In addition, the Court is able to study exhibits in depth and carry on colloquies with witnesses, expert and non-expert alike, in an orderly and systematic manner. Of course, this is in addition to the Court's knowledge of the litigation resulting from its review of the record since the cases were filed.

In the light of the limitation of a jury to determine the facts in an *informed manner* and the ability of the Court to hear and review the evidence in an efficient and effective manner, the Court believes that it would be more capable of fairly deciding the facts.

### V

■ The Court is of the opinion that the third part to footnote 10 in *Ross v. Bernard, supra,* is of constitutional dimensions. It must be seen as a limitation to or interpretation of the Seventh Amendment. Furthermore, the Court is of the opinion that there is no conflict in this case with any statutory policy favoring trial by jury, 28 U.S.C.A. § 1861, or the Federal Rules of Civil Procedure.

The explosion of litigation in the past two decades in terms both of number of filings and the complexity and scope of many of those cases has led thoughtful minds to wonder whether the judicial system as we now know it can cope with some of these cases. *See e. g.,* Rifkind, *Are We Asking Too Much of Our Courts?* 70 F.R.D. 96 (1976).

Similarly, thoughtful minds have questioned the expansion of the right to jury trial in complex commercial civil actions. *See Redish, supra,* at 514–530. It has been observed that:

> Any close question—and sometimes one that is not so close—is resolved in favor of the jury trial right without serious analysis of history, precedent, or policy. Shapiro and Coquillette, The *Fetish of*

*Jury Trial in Civil Cases: A Comment on Rachal v. Hill,* 85 Harv.L.Rev. 442 (1971).

While it is true that the Supreme Court has favored jury trial in the cases where it has reviewed the issue, the opinions are not totally consistent. *Compare Ross v. Bernard, supra, with Katchen v. Landy,* 382 U.S. 323, 339, 86 S.Ct. 467, 15 L.Ed.2d 391 (1966).

With these thoughts in mind, the necessity for the appearance and fact of fairness dictate that the motions now before the Court be GRANTED.

■ Because of the effect of this Order, the Court hereby certifies this question for appeal under 28 U.S.C.A. § 1292(b). The question is a controlling one as to which there is likely to be substantial grounds for difference of opinion. Resolution of the issue prior to trial will materially advance termination of the litigation because it would avoid a re-trial on this ground. The Court will retain jurisdiction of the remainder of this litigation.

It is so Ordered.

### APPENDIX

### FIRST CLAIM

21. The Ebasco proxy and certified consolidated financial statements furnished by Boise and Andersen to Newsprint and its shareholders, the representations contained in the merger agreement and closing papers, and the representations contained in the other financial statements and reports referred to hereinbelow, were false, fraudulent, misleading and deceitful within the meaning of Sections 12(2) and 17(a) of the Securities Act of 1933 (15 U.S.C. Sections 77*l*(2) and 77q(a)), and Sections 10(b) and 13(a) of the Securities Exchange Act of 1934 (15 U.S.C. Sections 78j(b) and 78m(a)), and Rule 10b–5 thereunder and 17 CFR 24010B–5 because, among other things, they failed to disclose the following:

a. On July 12, 1968, the U. S. District Court for the Southern District of Idaho had rendered judgment against Boise in the amount of $318,000 for income taxes due as

a result of the tax accounting used by Boise for mergers and acquisitions prior to 1962. The net effect of this decision was to seriously question the propriety of the methods used to record additional merger acquisition transactions on the books of Boise. Application of the same principles used by the U. S. District Court for such other transactions created a tax liability of approximately $5,000,000 which was not adequately disclosed in said proxy or in said consolidated financial statements, or otherwise. In addition, several million dollars in other tax liabilities were not disclosed.

b. (i) In 1967, Boise purchased a 44% interest in Burnett-Boise Corporation ("Burnett-Boise"), the wholly-owned subsidiaries of which were engaged in the construction business. By December 31, 1968, and September 30, 1969, Boise had underwritten or guaranteed in writing performance bonds of subsidiaries of Burnett-Boise, including Winston A. Burnett Construction Co. of New York, Inc., in excess of $20 million, substantially all of which were outstanding at the time of the merger heretofore described. At no time during 1967, 1968, 1969 or 1970 did any published financial statement of Boise or the proxy issued in the Ebasco Industries, Inc. merger mention, disclose, or intimate this potential liability. Boise subsequently incurred an approximate $40 million loss arising out of said financial relationship with Burnett-Boise.

(ii) At all times Boise controlled the operations, furnished all working capital and controlled the budget, capital expenditures and financial decisions of Burnett-Boise and its subsidiaries and therefore should have included the accounts of Burnett-Boise in its consolidated financial statements, which it failed to do. In mid-1969, Boise acquired an additional 7% interest in Burnett-Boise but, to avoid the appearance of control and further avoid including the accounts of Burnett-Boise in Boise's consolidated financial statements, Boise deceptively placed 2% of said stock in "friendly hands," to wit, in the name of one of its attorneys. Because of substantial losses incurred by Burnett-

Boise, the failure to have included the accounts of Burnett-Boise in Boise's consolidated financial statements rendered said consolidated financial statements inaccurate and deceptive.

c. (i) In 1967 Boise entered the recreational land market and, in 1968 and 1969 expanded its recreational land operations in California and elsewhere. By the end of 1968, Boise's operations in its Home and Land Division, including its recreational land operations, constituted a major revenue and net income producing activity of the corporation, but Boise's consolidated financial statements, annual reports, the Ebasco proxy, and other public announcements failed fully to disclose the extent to which Boise's total revenue and net income consisted of a disproportionate amount of revenue and net income derived from its Home and Land Division, including recreational land sales, and thus gave the false impression that Boise's other operations were producing more profit than was in fact the case.

(ii) Moreover, the manner in which Boise accounted for and reported in said consolidated financial statements, reports and proxy the results of its Home and Land Division operations, including recreational land operations, substantially overstated revenue and net income in at least the following respects:

(a) As it sold lots in said recreational areas, Boise entered as current revenue and net income upon its books the entire amount of the sales price and profit, even though the purchasers made an inadequate down payment, normally as little as 10% or less of the total price, undertaking long term obligations for the balance. Little or no investigation of the credit of the purchasers was made prior to such sales. The inclusion of the entire net income in the consolidated financial statements in the year of the down payment was improper, deceptive and financially unrealistic. Moreover, Boise failed or omitted to establish on its books and financial statements any realistic or appropriate reserve for bad debts in connection with the long term obligations.

(b) Boise failed to make proper provision for discount reserves, i. e., reserves reflecting the difference between the interest rate charged on the notes taken from land sale purchasers and the then-current market rate of interest.

(c) Boise improperly recorded as revenue and net income bulk sales, sales to salesmen, and sales to other groups and syndicates.

(d) Expenditures required to complete the projects, and to install improvements and amenities, were based on arbitrary and unrealistic estimates. Furthermore, no provision was made for the cost of various amenities which Boise salesmen represented and warranted to purchasers would be installed. No realistic amounts for future project costs of completion were included by Boise in its financial statements.

(e) Boise improperly allocated unit land costs to the cost of goods sold so as to understate the costs of goods sold for more desirable lots, overstate the value of the remaining land inventory, and consequently to overstate profits derived from the sale of recreational land.

(f) Boise artificially and improperly inflated the value of land taken back into inventory, as a result of forfeitures, rescissions or otherwise, by capitalizing unearned profits and the costs of amenities on prior sales, and valued said land in excess of cost and market value.

(g) Boise failed to make proper provision for the effect of rescissions and civil liabilities arising out of the improper sales methods followed in the sale of recreational land, as referred to in subparagraph d below.

(iii) Boise's quarterly financial statements for the first three quarters of each year, including 1969, failed to recognize ratably and proportionately various adjustments made in the fourth quarter and therefore overstated net income for the first three quarters accordingly. The effect of said fourth quarter adjustments was concealed by the device of pooling the financial results of profitable companies acquired by merger during the year.

(iv) Said consolidated financial statements and reports did not contain any footnotes or other statements disclosing, adequately or. at all, the facts and reporting methods described in subparagraphs (i), (ii) and (iii) above. The 1970 certified annual consolidated financial statements, issued on February 26, 1971, included for the first time, as a footnote ( # 1), the following disclosure:

"A sale is recognized in recreation community projects when a cash down payment of at least 10% on the principal amount has been received and a formal contract has been executed. When an installment note is received in lieu of full cash payment, revenue is reduced by discounting the receivable to yield two percentage points in excess of the prime commercial rate, or 9%, whichever is greater."

(v) Boise ultimately sustained substantial losses with respect to its Home and Land operations, including its recreational land operations, requiring the company to "write down" the carrying value of various assets due to the prior overstatements of income and to reserve for certain future costs, in the amount of approximately $200 million.

d. The practices and business methods followed by Boise in the development and marketing of its recreational properties were improper, fraudulent and false, as a consequence of which Boise was, at the time of the merger and remains, exposed to substantial civil liability with the possibility of rescission of said land sales. At the time of the merger, it was foreseeable that the improper, fraudulent, and false practices would materially impair Boise's business and its ability to market its recreational properties to the public. No disclosure of these matters was made to Newsprint or its shareholders in connection with the merger, nor was any reserve or other provision made for such liability. Subsequent to the merger, these development and marketing practices were the basis of numerous civil actions against Boise brought by the State of California and by private individuals, leading to the payment by Boise of many

millions of dollars (directly to lot purchasers and by the installation of additional amenities), and to the rescission of purchases, in settlement of said actions.

e. With respect to the matters described in subparagraphs (a), (b), (c) and (d) above, Boise and Andersen and each of the individuals named in paragraphs 8 through 13, knew or reasonably should have known the facts alleged in said subparagraphs at all relevant times and prior to the effective date of said merger.

## SUPPLEMENTAL ORDER STRIKING JURY DEMAND

This matter comes before the Court by way of letter of plaintiffs' counsel dated August 20, 1976, addressed to the Court, with copies to the Special Master and all counsel. Although the practice of addressing letters to the Court, rather than following the practices and procedures required by the Federal Rules of Civil Procedure and the Local Rules of this Court, is not favored, the Court will accept this letter as a motion to reserve an issue for appeal.

The letter indicates as follows:

> "Although plaintiffs appreciate the willingness of the Court to certify the jury question for an interlocutory appeal, upon thorough reconsideration by all of plaintiffs' counsel in the light of presently existing circumstances, we have concluded that the most advisable course is to continue with pretrial proceedings as now scheduled with a view toward trial by the Court, respectfully reserving our right to appeal."

The record indicates that on June 1, 1976, the Court stated to all counsel that

> "It would obviously be improper for me to strike the jury demand now and then try the case and have the Circuit Court tell me I was wrong. We are not going to try this case twice. So if counsel wish to have the matter certified for appellate review at this time, we can do so. I see no reason why this court can't, while that matter is being reviewed, retain jurisdic-

tion to continue on with the discovery process."

Thereafter, on August 12, 1976, the Court struck the jury demand by order and opinion reciting in part as follows:

> "Because of the effect of this Order, the Court hereby certifies this question for appeal under 28 U.S.C.A. § 1292(b). The question is a controlling one as to which there is likely to be substantial grounds for difference of opinion. Resolution of the issue prior to trial will materially advance termination of the litigation because it would avoid a re-trial on this ground. The Court will retain jurisdiction of the remainder of this litigation."

The aforementioned letter of August 20, 1976 indicates that plaintiffs' counsel will not seek appellate review at this time but that, instead, plaintiffs will proceed with trial before the Court, "reserving" the jury trial issue for possible appeal.

There are substantial grounds for difference of opinion on the Constitutional question involved and to undertake a complex, expensive, five-to-six-month trial with a reasonable possibility that the reviewing authority might order a second trial would be highly prejudicial to the parties and a gross imposition on this Court. Therefore, the Court finds, concludes and ORDERS that plaintiffs' failure to proceed with interlocutory appeal constitutes a waiver and withdrawal of its jury demand.

The Clerk of this Court is instructed to send uncertified copies of this Order to all counsel of record and to the Special Master.