662 F.2d 910
 31 UCC Rep.Serv. 1375, 8 Fed. R. Evid. Serv. 1621
 The CITY OF NEW YORK and The New York City Transit
Authority, Plaintiffs-Appellees,
v.
PULLMAN INCORPORATED, Pullman-Standard, a Division of
Pullman Incorporated, and Rockwell International
Corporation, Defendants-Appellants.
 Nos. 1462, 1463, Dockets 81-7162, 81-7164.
 United States Court of Appeals,
Second Circuit.
 Argued June 3, 1981.
Decided July 29, 1981.
Rehearing Denied Sept. 23, 1981.
 
 Donald I. Strauber, New York City, (Charles H. Harff, Richard J. Ney, Jerome C. Katz and Chadbourne, Parke, Whiteside & Wolff, New York City, on the brief), for defendant-appellant Rockwell Intern. Corp.
 Philip C. Potter, Jr., New York City (Thomas J. Aquilino, Jr., Paul R. Koepff, Michael Mills, Katherine B. Jenks and Davis, Polk & Wardwell, New York City, on the brief), for defendants-appellants Pullman Inc. and its Division, Pullman Standard.
 Arthur L. Liman, New York City (George P. Felleman, Leslie G. Fagen, Richard A. Rosen, Harry Frischer and Paul, Weiss, Rifkind, Wharton & Garrison, New York City, on the brief), for plaintiff-appellee The New York City Transit Authority.
 Bruce S. Kaplan, New York City (Allen G. Schwartz, Corp. Counsel of the City of New York, New York City, on the brief), for plaintiff-appellee The City of New York.
 Before WATERMAN and TIMBERS, Circuit Judges, and LASKER, District Judge*.
 TIMBERS, Circuit Judge:
 
 
 1
 This is the case of a wise and comprehending trial judge whose three decades of experience on the federal bench had a direct bearing upon what we hold to have been correct rulings in this important case tried to a jury in November and December 1980.
 
 
 2
 The City of New York and The New York City Transit Authority (appellees) commenced this action[1] to recover from Pullman Incorporated, Pullman-Standard, a division of Pullman Incorporated, and Rockwell International Corporation (appellants) for breach of warranty arising from Pullman's sale of 754 subway cars to appellees.
 
 
 3
 At the conclusion of a five and one-half week trial, Edward Weinfeld, District Judge, the jury awarded $72 million in damages to appellees. From the amended judgment entered on that verdict on January 6, 1981, and the district court's order denying appellants' motion for a new trial or for judgment n.o.v., this appeal was taken.
 
 
 4
 We find that the principal questions presented on appeal are:
 
 
 5
 (1) Whether an interim report by the staff of the Urban Mass Transit Administration was properly excluded as hearsay. We hold that it was.
 
 
 6
 (2) Whether the district court properly instructed the jury regarding the measure of damages for breach of warranty. We hold that it did.
 
 
 7
 Other claims of error raised by appellants have been fully considered.
 
 
 8
 We affirm the judgment and order of the district court for the reasons stated below.
 
 I. FACTS
 
 9
 On August 30, 1972, Pullman Incorporated and its division Pullman-Standard (together referred to as Pullman) contracted to sell 754 "R-46" subway cars to The New York City Transit Authority, acting for The City of New York. The total contract price was approximately $210 million. Rockwell International Corporation (Rockwell), under a subcontract with Pullman, agreed to design and manufacture 1,548 undercarriages or "trucks" for the R-46 cars at a subcontract price of about $20 million. The first of the R-46 cars was delivered to the City for testing in March 1975. Following the completion of on-line tests, deliveries continued until December 1978. By that time all 754 cars were in appellees' possession.
 
 
 10
 The R-46 cars were radically different from any subway cars which previously had been used in New York City. "Standard" cars, which had been purchased by the Transit Authority exclusively before the R-46 contract, had a coil-spring suspension and sat on a rigid single-frame steel casting which served as the undercarriage of each car. The R-46 had under each car a rubber primary suspension and an air bag secondary suspension, as well as a two piece frame, or dual, undercarriage.
 
 
 11
 Each undercarriage on the R-46 car had a cross-piece, or transom arm, which supported a 1700 pound motor. On March 27, 1977, a transom arm on the undercarriage of one of the R-46 cars in service fractured, causing the 1700 pound motor it supported to fall through upon the axle. Between March 1977 and the beginning of the trial of the instant case, periodic inspections disclosed potentially hazardous cracked transom arms on approximately 1000 of the 1548 undercarriages provided under the R-46 contract. One hundred of those undercarriages had to be scrapped. Those R-46 cars which are still operating have remained in service through a program of periodic inspections and spot-welding of cracks.
 
 
 12
 Pullman and Rockwell do not challenge on appeal the jury's essential finding that they were jointly liable for the failure of the R-46 cars.[2] According to the uncontroverted evidence, Rockwell designed the R-46 cars to withstand an average stress of 2.5g's, or 2.5 times the weight of the motor, when the cars were in service. When tested, the transom arms safely withstood up to 7g's. Once the subway cars were in use, however, the transom arms in fact were regularly subject to stresses of up to 18 times the weight of the motor-far more than the transom arms safely could withstand on a regular basis. The transom arms therefore cracked. Appellees claimed at trial that the unique suspension system and dual undercarriage design employed in the R-46 cars simply were unsuited for the actual use of the cars because they caused excessive vibration. They also claimed that other design, manufacture and testing flaws contributed to the serious cracking problem.
 
 
 13
 Soon after this problem developed, appellants designed a system for repairing the R-46 cars, referred to as a "retrofit". Appellants proposed in this way to correct the defects in the cars. The proposal essentially amounted to replacing the rubber suspension on the R-46 trucks with a coil-spring suspension similar to that used in standard undercarriages. Rockwell's testing of the retrofit design showed that the coil-spring suspension would reduce the peak stress on the transom arms to 7.5g's and would reduce the average stress on the transom arms to acceptable levels.
 
 
 14
 Appellants declined, however, to conduct additional testing requested by appellees to determine what effect the retrofit would have on other parts of the cars. Appellants asserted that the tests would be "irrelevant." Experts employed by the Transit Authority concluded that the retrofit would put stresses on untested parts of the cars that were not designed to take heavy loads and would not solve what they considered to be the fundamental problem, namely, that the dual undercarriage structure of the R-46 cars caused the cars to vibrate excessively and to crack. Appellees still claim that the retrofit would solve the R-46 safety problems. On May 1, 1979, the Transit Authority Board of Directors rejected the retrofit proposal as unsafe.
 
 
 15
 The instant action for breach of warrant by appellees against appellants was commenced on July 14, 1979.
 
 II. UMTA REPORT
 
 16
 Appellants claim that the district court erred in refusing to admit a report prepared by the staff of the Urban Mass Transit Administration (UMTA). UMTA is a federal agency to which the Secretary of Transportation has delegated his statutory duty to investigate unsafe conditions in facilities and equipment financed under the Urban Mass Transportation Act[3] and to review state or municipal programs for the correction of those unsafe conditions. National Mass Transportation Assistance Act of 1974 § 107, 49 U.S.C. § 1604a (1976). The report, dated April 4, 1980 and prepared as a recommendation to the Administrator of UMTA, reviewed various proposals for correction of the cracking problem affecting the R-46 undercarriages, including the retrofit and the replacement programs which later were brought to the attention of the jury in the instant case. The report concluded that the retrofit was the surest way of immediately correcting the R-46 safety problem, but reached no conclusion on the question of whether the retrofit provided an effective long-term solution to the safety problem.
 
 
 17
 At trial, appellants sought to introduce the UMTA report or testimony regarding its conclusions. They claimed that the report rebutted appellees' contention that the retrofit was unsafe. Appellants argue here that the district court's refusal to admit the report, or testimony about its "findings", deprived them of a fair trial with respect to damages. They assert that the report-which was written by employees of the only government agency other than those of The City of New York and The Transit Authority which evaluated the safety of the retrofit-was relevant non-hearsay which would have led the jury to find that The Transit Authority Board of Directors unreasonably failed to mitigate damages when it rejected the retrofit. We disagree that it was error to reject the report.
 
 
 18
 Contrary to appellants' claims at trial and on appeal, we hold that the hearsay report was not admissible as the record, report, or statement of a government agency pursuant to Fed.R.Evid. 803(8)(C). That Rule provides for the admission in evidence, in civil actions, of government agency reports which otherwise would be excludable as hearsay, if those reports constitute "factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness." As with any exception to the rule against hearsay, Rule 803(8)(C) is to be applied in a commonsense manner, subject to the district court's sound exercise of discretion in determining whether the hearsay document offered in evidence has sufficient independent indicia of reliability to justify its admission. LeRoy v. Sabena World Airlines, 344 F.2d 266, 272 (2 Cir.), cert. denied, 382 U.S. 878 (1965); see Swietlowich v. County of Bucks, 610 F.2d 1157, 1165 (3 Cir. 1979); Weinstein and Berger, 4 Weinstein's Evidence P 803(8)(03) (1979). In applying that rule to the UMTA report, it is clear to us that the district court did not abuse its broad discretion, Miller v. New York Stock Exchange, 550 F.2d 762, 769 (2 Cir.), cert. denied, 434 U.S. 823 (1977), in excluding the document as hearsay.
 
 
 19
 By its own terms, the UMTA report was not the final report or finding of a government agency within the meaning of the Rule, but was an "interim" staff report in the form of a recommendation to the Administrator. As an interim report subject to revision and review, the report did not satisfy the express requirement of the Rule that the proffered evidence must constitute the "findings" of an agency or official. Zenith Radio Corp. v. Matsushita Electric Industrial Co., 505 F.Supp. 1125, 1145 (E.D.Pa.1980). In so holding, we do not rely merely on the staff's use of the term "interim," but we attach substantial significance to the fact that the report expressly declined to state a conclusion on the most significant safety question-whether the retrofitted R-46 cars would provide long-term safety, although important static and fatigue tests requested by appellees never had been performed.[4] Accordingly, while the UMTA report included broad conclusory language which might have been used to advantage at trial, as appellants claim, a close reading of the report makes it evident that the broad language did not embody the findings of an agency, but the tentative results of an incomplete staff investigation. We hold that it was properly excluded. Pollard v. Metropolitan Life Ins. Co., 598 F.2d 1284, 1286-87 (3 Cir.), cert. denied, 444 U.S. 917 (1979). It also is significant that the UMTA Administrator did not accept the recommendation of the staff report to the extent that the staff stated a preference for the retrofit proposal.[5] Franklin v. Skelly Oil Co., 141 F.2d 568, 572 (10 Cir. 1944).
 
 
 20
 Moreover, the "findings" set forth in the report were not based on independent testing by the UMTA, or tests which had been verified by UMTA, or even test results which were the subject of formal administrative hearings. Instead, the UMTA staff relied upon "hand-outs" from the parties to this action which consisted largely of data derived from tests conducted by appellants themselves. This lack of formal verification or procedure itself was sufficient to justify the exclusion of the report as untrustworthy. United States v. Corr, 543 F.2d 1042, 1051 (2 Cir. 1976); Notes of Advisory Committee, Fed.R.Evid. 803(8)(C), 28 U.S.C.A. at 590 (1975).
 
 
 21
 In our view, no other exception to the hearsay rule would have permitted the admission of the UMTA report.[6] Even if the report was admissible, however, the district court did not abuse its discretion in holding, in the alternative, that the report should be excluded under Fed.R.Evid. 403 because the likelihood that it would confuse the jury and protract the proceedings outweighed its probative value. United States v. Robinson, 560 F.2d 507 (2 Cir. 1977), cert. denied, 435 U.S. 905 (1978). Judge Weinfeld's decision represented an eminently sound exercise of discretion. First, the report was prepared for very different purposes that those for which it was offered at trial. The UMTA staff was attempting to determine the quickest solution for an immediate safety problem, and not whether The City of New York and The Transit Authority would get what they bargained for-subway cars which would be safe and dependable for up to 35 years. Second, as a so-called government report which in fact was incomplete and based largely on hearsay, the report would have been presented to the jury in "an aura of special reliability and trustworthiness" which would not have been commensurate with its actual reliability. United States v. Fosher, 590 F.2d 381, 383 (1 Cir. 1979); see United States v. Costello, 221 F.2d 668, 674 (2 Cir. 1955), aff'd, 350 U.S. 359 (1956); Weinstein and Berger, 1 Weinstein's Evidence P 403(04) (1980). Third, the admission of the report would have been likely to protract an already prolonged trial with an inquiry into collateral issues regarding the accuracy of the report and the methods used in its compilation. John McShain v. Cessna Aircraft Co., 563 F.2d 632, 636 (3 Cir. 1977).
 
 III. MEASURE OF DAMAGES
 
 22
 The case was submitted to the jury on essentially two competing theories of damages. Appellees claimed that they were entitled to the cost of replacing the R-46 undercarriages with standard trucks, and that in addition they were entitled to consequential damages including the cost of the inspection and spot-welding program. Appellees estimated the cost of the replacement program at $98 million. Appellants estimated that the same replacement program would cost $48 million. Appellants claimed that the accurate measure of damages was the cost of the retrofit which they estimated at $36 million. They asserted that any additional damages sustained by appellees resulted from an unreasonable refusal to mitigate damages in rejecting the retrofit. In returning a general verdict, the jury found appellants jointly liable for $72 million damages.
 
 
 23
 Appellants contend that the district court improperly instructed the jury on the measure of damages for their breach of warranty and that the damage award was tainted by the admission of assertedly irrelevant data on the current replacement cost of the R-46 undercarriages.
 
 
 24
 As the district court correctly instructed the jury, the appropriate measure of damages for breach of warranty in this action is "the difference at the time and place of acceptance between the value of the goods accepted and that value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount." N.Y.U.C.C. § 2-714(2) (McKinney 1964).
 
 
 25
 Accordingly, absent special circumstances, appellees were entitled to recover the difference between the value of the R-46 cars as warranted-presumably the contract price of $210 million, Ritter v. Ehrlich, 152 F.2d 181 (2 Cir. 1945)-and the value of the cars as delivered. Appellees claimed in the district court that special circumstances justified a different measure of damages.
 
 
 26
 While the district court in its charge declined to summarize the evidence, the court did instruct the jury that appellants claimed that the proper measure of the difference in value between the goods as warranted and as delivered was the cost of the retrofit; and that this, appellants claimed, was the cost of adapting the R-46 cars so that they would operate as warranted. See White and Summers, Uniform Commercial Code 308 (1972). The court further instructed the jury that appellees claimed that they came within the "special circumstances" provision of § 2-714(2) because (1) a subway car with its undercarriage is a unique commodity which is not bought and sold in the market place; (2) the necessary concern of passenger safety distinguished the transaction from the purchase of an ordinary commodity; and (3) the design of the trucks was such that they could not be effectively repaired. The court told the jury that it could find that "in those circumstances" appellees were entitled to the cost of replacing the dual undercarriages with standard, single frame undercarriages. We hold that the district court's instructions were essentially correct.[7]
 
 
 27
 First, we reject appellants' claim that appellees' damages should have been limited to the subcontract price of the undercarriages, approximately $20 million. As the district court correctly observed in denying appellants' motion for a new trial or judgment n. o. v., appellees did not contract for undercarriages but for a fleet of completed subway cars with a contract price of $210 million. Accordingly, even absent the "special circumstances" provision of the statute, appellees were entitled to damages based on the value of what they bargained for-safe cars-and not the value of the subcontract between Rockwell and Pullman, to which appellees were not parties. White and Summers, supra, at 307-08.
 
 
 28
 Second, we reject appellants' claim that the damage award somehow was tainted because the district court failed to instruct the jury that the cost of replacing the R-46 undercarriages provided for in the contract with recast undercarriages of the same design was one possible measure of damages. Appellants argue on appeal that the district court erred because its charge required the jury to choose between the retrofit and complete replacement with redesigned trucks, thus precluding the jury from awarding an intermediate amount of damages.
 
 
 29
 Generally, a litigant is entitled to have the trial judge inform the jury of all claims and theories of law which have been brought to the attention of the court and jury and are supported by the evidence. Oliveras v. U. S. Lines Co., 318 F.2d 890, 892 (2 Cir. 1963). On the evidence in this case, however, appellants were not entitled to an instruction on the cost of replacement with recast R-46 undercarriages because their claim that this was an appropriate remedy was not supported by evidence of any probative value. True, the recasting option was referred to at trial and was argued to the jury as an appropriate measure of damages, but it was not substantiated by the evidence. Indeed, the only evidence that recasting was a viable option emerged in the examination of one witness during a trial that lasted five and one-half weeks. That testimony occupied one and one-half pages of a trial transcript which exceeded 5000 pages. Moreover, the one witness who referred to the recasting option dismissed it as a "waste of money". There was no evidence that, in the months of negotiation which preceded this action, appellants ever suggested to appellees that the recasting option was a viable means of eliminating the safety problem.
 
 
 30
 The burden was on appellants to prove that the recasting option was a viable means of reducing damages. Caiazzo v. Volkswagenwerk, A. G., 468 F.Supp. 593, 598-99 (E.D.N.Y.1979). Having failed to adduce probative evidence in support of that claim, they cannot now assert with any force that the district court precluded the jury from considering the recasting option. The district court is not obliged to charge every contention made by the parties at trial, Puggioni v. Luckenback S. S. Co., 286 F.2d 340, 344 (2 Cir. 1961), as long as the charge itself, taken as a whole, is fundamentally fair. Clark v. John Lamula Investors Inc., 583 F.2d 594, 600 (2 Cir. 1978). This is especially so where, as here, the district court informed the parties in advance that it would not give the jury a detailed summary of the evidence. Mesuda v. Kawaski Dockyard Co., 328 F.2d 662, 665 (2 Cir. 1964). The district court here informed the jury of the outside damage claims of each side and, as it advised the parties in advance, did not explicitly instruct the jury on a number of intermediate measures of damages.[8] The verdict itself demonstrates that the charge did not thereby preclude the jury from selecting an intermediate measure of damages.
 
 
 31
 Third, we reject appellants' claim that it was error for the district court to permit the jury to assess damages under the "special circumstances" provision of the statute. Under the plain terms of § 2-714(2), a measure of damages other than that expressly provided by the statute may be employed when difference in value at the time and place of acceptance will not adequately compensate the buyer for its proximate damages. Superwood Corp. v. Larson Stang, Inc., 311 F.2d 735, 738-39 (8 Cir. 1973); Craig Liquors v. Foreign Vintages, Inc., 276 App.Div. 601, 96 N.Y.S.2d 553 (1st Dept. 1950); Aldock v. Wnuk, 198 Misc. 474, 98 N.Y.S.2d 964 (Sup.Ct., Nassau Co., 1950). There was ample evidence from which the jury could have found that appellees would not be compensated for their damages by a recovery based on the difference in value at the time of the breach. This was so because the general unavailability of subway undercarriages on the open market and the design requirements dictated by safety concerns precluded the possibility of replacing the defective trucks with those bought on the open market when the breach occurred.
 
 
 32
 Where special circumstances justify the use of a measure of damages other than that expressly provided by the statute "plaintiff may recover for its direct damages in any manner that is reasonable." American Power Co. v. Westinghouse Electric Corp., 418 F.Supp. 435, 454 n.34 (S.D.N.Y.1976); Official Comments 2 and 3 to N.Y.U.C.C. § 2-714 (McKinney 1964). An appropriate measure of damages under that provision is the "actual cost" of a remedy that meets the ultimate requirements of the contract by converting non-conforming goods into goods which will perform as warranted-even if that remedy required replacing defective parts with parts substantially different than those provided under the contract, at a time later than delivery-as long as that remedy meets the ultimate requirements of the contract "at the lowest cost and with the least delay". District Concrete Co. v. Bernstein Concrete D. C., 418 A.2d 1030, 1036 (D.C.App.1980); see Curtis v. Murphy Elevator Company, 407 F.Supp. 940, 948 (E.D.Tenn.1976). Accordingly, the jury here was properly permitted to employ the "special circumstances" language to arrive at a measure of damages based on current replacement costs as the amount necessary to compensate appellees for breach of warranty.
 
 
 33
 For the reasons stated above, we reject appellants' claim that evidence of the current replacement cost of the defective undercarriages was irrelevant. While such evidence may properly be excluded where there are no "special circumstances", Tennessee Carolina Transportation Inc. v. Strick Corp., 283 N.C. 423, 196 S.E.2d 711 (1979), here such evidence was relevant to the calculation of the actual damages appellees claimed to have sustained.[9]
 
 
 34
 Fourth, we reject appellants' claim that a damage award based on the cost of replacing the R-46 cars with standard, substantially different, trucks was inappropriate because it gave appellees more than they bargained for. If appellees convinced the jury-as presumably they did-that the dual undercarriage R-46 construction could not be made to perform as warranted, they were entitled to damages based on the cost of converting the cars into what they bargained for-dependable subway cars which would perform as well as, or better than, cars with standard undercarriages. District Concrete Co. v. Bernstein Concrete D. C., supra.
 
 IV. OTHER CLAIMS
 
 35
 We need not dwell at length on appellants' remaining claims of error.
 
 
 36
 This cause of action was not barred, with respect to any of the R-46 undercarriages, by the four year statute of limitations for breach of warranty actions. N.Y.U.C.C. § 2-725 (McKinney 1964). Appellants claim that their furnishing ten R-46 cars for pre-acceptance on-line testing by the Transit Authority before July 14, 1975 began the running of the statute, at least with respect to those cars,[10] and that any claim based on defects in those cars was time-barred when this action was commenced. We disagree.
 
 
 37
 Under the Uniform Commercial Code, as adopted in New York, the statute of limitations for breach of warranty begins to run when the seller tenders delivery of defective goods, unless the warranty expressly extends to future performance. N.Y.U.C.C. § 2-725(2) (McKinney 1964). Owens v. Patent Scaffolding Co., 77 Misc.2d 992, 354 N.Y.S.2d 778, (Sup.Ct., Kings Co., 1974), rev'd on other grounds, 50 A.D.2d 866, 376 N.Y.S.2d 948 (2nd Dept. 1975). "Tender of delivery" occurs when the seller puts "conforming goods at the buyer's disposition." N.Y.U.C.C. § 2-503(1) (McKinney 1964). Tender of delivery is further defined as "such performance by the tendering party as puts the other party in default if he fails to proceed in some manner." Official Comment to N.Y.U.C.C. § 2-503 (McKinney 1964).
 
 
 38
 The delivery of ten subway cars for final on-line tests and inspection pursuant to Specification 3.5 of the Equipment Contract between Pullman and appellees did not constitute such "tender of delivery" as would begin the running of the statute. The contract specifications provided that the R-46 design would be required to pass a 30 day on-line inspection before it would "conform" to the contract requirements. Until that inspection occurred, therefore, there could be no tender of "conforming goods" within the meaning of § 2-503(1). Moreover, under the contract appellees were not obliged to take any steps until appellants conformed to the specifications by delivering cars which had completed the 30 day test, since the contract specifically provided that any cars built before the 30 day test was completed were constructed at the seller's risk. Accordingly, tender of delivery could not occur, and did not occur, until the required test of the sample train was completed in December 1975. We hold that no aspect of appellees' cause of action was time barred.
 
 
 39
 Finally, we turn to Rockwell's claim that the district court erred in denying its motion to strike appellees' jury demand because, according to Rockwell, the "retrofit or replacement" issue was too complex for any jury to decide rationally. In pressing this claim, Rockwell urges us to adopt a so-called "complexity exception" to the Seventh Amendment's guaranty of a jury trial in civil actions, as some other courts have done. E. g., In re Japanese Electronic Products Antitrust Litigation, 631 F.2d 1069 (3 Cir. 1980); Bernstein v. Universal Pictures, 79 F.R.D. 59 (S.D.N.Y.1978); but see In re U. S. Financial Securities Litigation, 609 F.2d 411 (9 Cir. 1979) (holding that no such exception exists). This Court has expressly reserved the question of whether such an exception ever would be appropriate. Rosen v. Dick, 639 F.2d 82, 86 (2 Cir. 1980).
 
 
 40
 Rockwell contends that scientific testimony on the effectiveness of the retrofit, involving sophisticated applications of metallurgy and engineering, made this case too complex for the jury to understand or decide on a rational basis, thus bringing it within the scope of this assertedly "developing" doctrine. But see Rosen v. Dick, supra, 639 F.2d at 86. We disagree. Assuming arguendo that the "complexity exception" is ever appropriate-and we do not reach that question here-this would not be a proper case for its application for the simple reason that this case was not too complex for a jury to decide.
 
 
 41
 In re Japanese Electronic Products Antitrust Litigation, supra, the case upon which Rockwell chiefly relies, held that, in determining whether the "complexity exception" applies, courts must consider a number of factors. These include the estimated length of the trial, see also In re Boise Cascade Securities Litigation, 420 F.Supp. 99 (W.D.Wash.1970) (4 to 6 month estimated trial time); the number of individual claims which must be reviewed separately, see also Bernstein v. Universal Pictures, Inc., supra, 79 F.R.D. at 70 (1000 individual claimants, 4 month estimated trial time); the complexity of the legal issues; and the ability of the district court to separate the complex aspects of the case from those which might be tried to the jury.
 
 
 42
 In the instant case all of those factors suggest that the district court did not err in denying Rockwell's motion to strike appellees' jury demand. The legal issues were simple and discrete. The trial was not unduly long. Furthermore, we do not understand Rockwell to claim that the jury was in any way incompetent to decide the question of liability. Since no motion was made in the district court for a separate trial of the relatively complex issue of damages after determination of the issue of liability, that question is not before us.
 
 
 43
 Moreover, while complex scientific testimony was adduced at trial, we cannot ignore the purpose for which that testimony was offered in considering whether the jury was competent to perform its function in a rational manner. The jury here essentially was asked to determine whether the Transit Authority Board of Directors-which is not composed of engineering and metallurgy experts-acted rationally in rejecting the conclusions of Rockwell's experts who advised that the retrofit was safe. Presumably the jurors were competent to make this determination in the same manner that the Board did-by using common sense in weighing the technical arguments advanced. Assuming arguendo that a "complexity exception" might be appropriate in some cases-and we emphatically do not suggest that there is or should be such an exception-we hold here that such an exception would not have been appropriate since the jury was merely asked to determine whether a group of non-scientists acted in a rational manner.
 
 V. SUMMARY
 To summarize our essential holdings:
 
 44
 (1) The UMTA staff report was hearsay, was not admissible under any exception to the hearsay rule and was properly excluded from evidence. Moreover, even if the report was not hearsay, we would hold that the district court did not abuse its discretion under Fed.R.Evid. 403 in excluding it.
 
 
 45
 (2) Evidence regarding the current replacement cost of the defective R-46 undercarriages was properly admitted as relevant to appellees' claim under the "special circumstances" provision of N.Y.U.C.C. § 2-714(2).
 
 
 46
 (3) The district court instructed the jury properly on the measure of damages for breach of warranty.
 
 
 47
 (4) No aspect of appellees' cause of action was barred by the statute of limitations.
 
 
 48
 (5) Even if a "complexity exception" to the Seventh Amendment's guaranty of a jury trial in civil actions might be appropriate in some circumstances, this was not a proper case for the application of such an exception, for the simple reasons that this case was not too complex for a jury to decide.
 
 
 49
 We have considered carefully all of appellants' claims of error and find them to be without merit.
 
 
 50
 Affirmed.
 
 ON PETITIONS FOR REHEARING
 PER CURIAM:
 
 51
 The only matter in appellants' petitions for rehearing filed August 12, 1981 addressed to the panel which we believe warrants brief mention is appellant Pullman's reference to the decision of the Court of Appeals for the First Circuit in Robbins v. Whelan, 653 F.2d 47 (1 Cir. 1981), which Pullman contends supports its claim that the UMTA report should have been admitted pursuant to Fed.R.Evid. 803(8)(C).
 
 
 52
 We believe that Robbins clearly is distinguishable from the instant case and provides no support for appellants' contentions. First, the report found admissible in Robbins was a final report. The excluded report in the instant case was an interim report only and was subject to review Second, the information contained in the report in Robbins was provided by persons not involved in the litigation in any way. In the instant case, on the other hand, the bulk of the information in the excluded report was provided to the agency by appellants themselves. Finally, and of primary importance, the information contained in the report in Robbins was derived from tests conducted according to detailed, objective standards published by the agency in the Code of Federal Regulations, and the third parties who conducted the tests were subject to statutory penalties for noncompliance with those standards. Robbins v. Whelan, supra, 653 F.2d at 51. Those objective standards, coupled with the sanctions for noncompliance, gave to the report a degree of reliability which was notably absent from the report in the instant case. Here the report was prepared from information furnished by the parties who conducted their own tests according to their own standards. As we stated in our opinion in the instant case, "(t)his lack of formal verification or procedure itself was sufficient to justify the exclusion of the report as untrustworthy." (citing authorities) City of New York v. Pullman Incorporated, supra, at 915.
 
 
 53
 Indeed, Chief Judge Coffin's thoughtful opinion in Robbins, in its analysis of Fed.R.Evid. 803(8)(C), strikes us as being consistent with our analysis of the same Rule. See Robbins, supra, 653 F.2d at 50-52; City of New York, supra, at 914-915.
 
 
 54
 We have considered carefully all of appellants' claims set forth in their petitions for rehearing addressed to the panel and find that they do not warrant granting the petitions.
 
 
 55
 Petitions for rehearing denied.
 
 
 
 *
 Hon. Morris E. Lasker, United States District Judge for the Southern District of New York, sitting by designation
 
 
 [1]
 The action originally was commenced in the New York County Supreme Court on July 14, 1979. Appellants removed it to the Southern District of New York on the basis of diversity of citizenship. 28 U.S.C. §§ 1332, 1441 (1976). On August 21, 1979, the district court denied appellees' motion to remand the case to the state court. 477 F.Supp. 438 (S.D.N.Y.1979)
 
 
 [2]
 Despite Pullman's liability on the judgment, the district court directed a verdict in its favor on its cross-claim against Rockwell for the full amount of the judgment in appellees' favor. It did so on the ground that Rockwell was solely responsible for the design and construction of the R-46 undercarriages
 
 
 [3]
 Under the Urban Mass Transportation Act, the federal government funded two-thirds of the $210 million dollar purchase price of the R-46 cars
 
 
 [4]
 As the report concluded, "additional assessment of the modified truck must be carried out to determine its suitability as a long-term solution; this assessment will include full truck laboratory testing (both static and fatigue) simulating the NYCTA environment and in-service performance evaluation." The report indicates that these were the tests requested by experts at The Transit Authority, but rejected by Rockwell as irrelevant
 
 
 [5]
 In a letter to The Transit Authority, the UMTA Administrator expressed no preference for the retrofit over the replacement program and stated that UMTA would approve either plan. Further, the letter stated that, if the retrofit was chosen, the replacement program nevertheless should be started in case the retrofit did not provide an adequate long-term solution. Letter from Theodore C. Lutz to Steven K. Kaufman dated May 22, 1980
 
 
 [6]
 The fact that the federal government, through UMTA, provided funding for the R-46 cars is not sufficient to create an agency relationship between the UMTA and The Transit Authority which might make the UMTA report admissible as the admission of an agent under Fed.R.Evid. 801(d)(2)(D). Harris v. Boreham, 233 F.2d 110 (3 Cir. 1956)
 
 
 [7]
 We believe that the district court also could have told the jury that even absent "special circumstances" it could award as damages the cost of replacing the R-46 undercarriages with standard trucks, measured at the time and place of acceptance instead of currently. If the jury found that the retrofit was unsafe, it could have found that the cost of replacing entirely the defective component with properly designed trucks was the proper measure of damages even if it did not find that "special circumstances" justified awarding the actual cost of replacement in current dollars. White and Summers, supra, at 377. The absence of such instruction resulted in a charge more favorable than that to which appellants were entitled
 
 
 [8]
 For example, appellees claimed that they were entitled to recover the cost of the inspection and spot-welding program in addition to the cost of the retrofit or replacement. Consistent with the court's notice to the parties that it would give a simplified charge, the jury was not instructed that it could award that specific measure of damages
 
 
 [9]
 The testimony of Transit Authority President John Simpson concerning the cost of the replacement program, based on corporate records, was not hearsay. W. L. Hailey & Co. v. County of Niagara, 388 F.2d 746, 754 (2 Cir. 1967)
 
 
 [10]
 Appellants also argue that their furnishing defective subway cars in early 1975 began the running of the statute of limitations for the entire contract and that the cause of action therefore was barred, not just for the first ten cars sent to the City, but for all of the cars delivered under the contract. Since we hold that the statute had not begun to run for the first ten cars, we need not reach the question of whether the entire cause of action was barred. In any event we hold that appellants' argument, based on N.Y.U.C.C. § 2-612(3) (McKinney 1964), is wholly unsupported and unsupportable. That section allows the buyer under an installment contract to repudiate the entire contract when a defect with respect to one installment impairs the value of the whole. Official Comment 6 to N.Y.U.C.C. § 2-612 (McKinney 1964). We find no justification for turning that protection for the buyer into protection for the seller by interpreting it to bar warranty actions with respect to defective goods which may not even have been built when the first non-conforming installment was delivered